# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| SANDRA R. WAINRIGHT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:03CV01185 |
| | ) | |
| CAROLINA MOTOR CLUB, INC., | ) | |
| t/a AAA CAROLINAS, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

SHARP, Magistrate Judge

This matter comes before the Court on the motion for summary judgment filed by Defendant Carolina Motor Club, Inc. t/a AAA Carolinas ("AAA"). (Pleading No. 12.) Plaintiff Sandra R. Wainright has responded in opposition to AAA's motion, and AAA has filed a reply. The motion is ready for a ruling.

### I. Procedural History

Plaintiff Wainright filed a Complaint in this court on December 15, 2003, alleging claims of race discrimination, retaliation, and wrongful discharge against her former employer AAA in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII"); 42 U.S.C. § 1981; and the common law of North Carolina. In her Complaint, Plaintiff demands a jury trial and seeks compensatory and punitive damages, back pay, front pay, attorney's fees, and costs. On February 17, 2004, AAA filed an Answer

denying the material allegations in Plaintiff's Complaint and asserting various affirmative defenses. On October 15, 2004, following the close of discovery, AAA filed the instant motion for summary judgment.[1]

## II. Statement of Facts

AAA is a member-owned organization that provides travel-related services to its members. AAA has 25 branch offices in North and South Carolina and is headquartered in Charlotte, North Carolina. (Pleading No. 13, Def.'s Mem. in Supp. of Summ. J., Linda Anderson Aff. ¶ 3.) Plaintiff Wainright, a black female, began working for AAA on July 2, 2001 as a Drive Vacation Specialist in AAA's Winston-Salem branch office. (Pleading No. 14, Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J., Ex. A, Sandra Wainright Aff. ¶ 2; Def.'s Mem. in Supp. of Summ. J., Sandra R. Wainright Dep. at 24-25.) As a Drive Vacation Specialist, Plaintiff worked at the front desk of the office and was responsible for greeting members, assisting members with travel-related requests, answering the telephone, completing transactions on a cash register, stocking travel maps, and other travel-related services. (Wainright Dep. at 29, 57-58, 87-88; Anderson Aff. ¶ 7.) Throughout Plaintiff's employment with AAA, Plaintiff was the only black employee in the 8-employee office. (Wainright Aff. ¶ 2; Wainright Dep. at 99; Anderson Aff. ¶ 7.)

---

[1] The parties have consented in writing to the trial jurisdiction of the United States Magistrate Judge, and the case has been referred to the undersigned for resolution. *See* 28 U.S.C. § 636(c).

Each AAA branch office has a Branch Manager who supervises all branch employees and has the authority to hire, fire, and discipline. (Wainright Dep. at 28-32, 103; Def.'s Mem. in Supp. of Summ. J., Thomas Gary Burton[2] Dep. at 11, 17-18.) Plaintiff was hired by Branch Manager Cathy Picone, a white female. (Wainright Aff. ¶ 2; Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J., Ex. E, Cathy Picone Aff. ¶ 8.) According to both Plaintiff and Picone, the working relationship between the two women was respectful and professional. (Wainright Aff. ¶ 31; Wainright Dep. at 79-80; Picone Aff. ¶¶ 9-12.) Picone disciplined Plaintiff only once: in December, 2001, Picone gave Plaintiff a written warning regarding Plaintiff's difficulty getting along with another employee. (Wainright Aff. ¶ 4; Wainright Dep. at 79, 98, Ex. 12; Picone Aff. ¶ 9.) In July, 2002, Picone gave Plaintiff a "meets expectations" performance review which led to a pay raise of $0.36 per hour. (Wainright Aff. ¶ 5, Attach. 1.) At the end of 2002, AAA gave Plaintiff a "Super Service Award" recognizing her customer service efforts. *Id.* ¶ 6, Attach. 2.

On January 21, 2003, AAA Regional Manager Martin Fenton, a white male, terminated Picone's employment. (Def.'s Mem. in Supp. of Summ. J., Martin Fenton Aff. ¶¶ 2, 4; Picone Aff. ¶ 6.) Fenton claims that he terminated Picone because she was disorganized and allowed her employees, including Plaintiff, to willfully disregard company rules and procedures. (Fenton Aff. ¶ 4.) Fenton believed that Picone's lax management style

---

[2] During the time relevant to this action, Burton was the Vice-President of Human Resources for AAA. (Burton Dep. at 6-7.)

caused the Winston-Salem branch to be the least profitable of AAA's branches. *Id.* On January 27, 2003, Fenton hired Linda Anderson, a white female, to replace Picone as Branch Manager of the Winston-Salem office. (Picone Aff. ¶ 6; Anderson Aff. ¶ 2; Fenton Aff. ¶ 5.) Fenton had worked with Anderson for 11 years at Mann Travel and believed that her "disciplined and capable management style" would make her the "perfect candidate" to replace Picone. (Fenton Aff. ¶ 5.)

Some time in January, 2003, Plaintiff asked Fenton if she could apply for an open travel agent position in the Winston-Salem office. (Wainright Dep. at 13, 15.) Fenton encouraged Plaintiff to apply for the position but suggested that she wait until after Anderson had become acclimated to her new position as Branch Manager. *Id.* Plaintiff maintains that she later asked Anderson about applying for the travel agent position, but again was encouraged to wait until Anderson felt comfortable in her new position and until Plaintiff could train her own replacement at the front desk. *Id.* at 16-17. Plaintiff admits that following these conversations, she chose not to apply for the travel agent position. *Id.* at 17. Anderson ultimately hired a white female with whom she was acquainted for the position. *Id.* at 134.

Shortly after Picone was terminated, Fenton asked Townes Carter to assume a leadership role during the transitional period until Anderson arrived and learned the responsibilities of the Branch Manager position. (Def.'s Mem. in Supp. of Summ. J., Townes Carter Aff. ¶ 9; Fenton Aff. ¶ 6.) Carter is a white male with less seniority than

-4-

Plaintiff who worked as a Drive Vacation Specialist in the Winston-Salem office. (Carter Aff. ¶ 2.) Fenton chose Carter to provide this assistance because he was the only employee in the Winston-Salem office who had experience performing each of the daily duties that arose in a branch office, including computer and financial issues. (Fenton Aff. ¶ 6; *see also* Wainright Dep. 85, 132-33.) Carter accepted this responsibility, which was temporary in nature and did not entail a change in job title, pay or benefits. (Carter Aff. ¶ 9; Fenton Aff. ¶ 6; Burton Dep. at 107.) At this time, there was no official position called "assistant manager" in any of AAA's branch offices. (Fenton Aff. ¶ 6; Wainright Dep. at 33, 36, 133-34; Burton Dep. at 13, 105, 107.) Plaintiff allegedly told Anderson that she "would like to be [the] assistant manager," but Anderson told her "to wait." (Wainright Aff. ¶¶ 11, 15.)

On Wednesday, April 9, 2003, Anderson discovered that Plaintiff's cash drawer was $41.00 short and left a note on Plaintiff's desk to that effect.[3] (Anderson Aff. ¶ 20, Ex. C; Wainright Aff. ¶ 19.) When Plaintiff next arrived for work, Anderson instructed Plaintiff that, per company policy, Anderson would count Plaintiff's cash drawer at the beginning and the end of her shift for a few days. (Anderson Aff. ¶ 21; Wainright Aff. ¶ 20; Wainright Dep. at 61.) Plaintiff was very dissatisfied with Anderson's decision to count her drawer

---

[3] The parties dispute the reason for Plaintiff's cash shortage. Plaintiff maintains that her drawer was short on April 9, 2003, because Anderson cashed a personal check to pay for a pizza out of Plaintiff's drawer and forgot to ring it up. (Wainright Aff. ¶ 22.) Anderson has proffered documentary evidence that pizzas were purchased on February 20 and March 27, 2003, and that on April 9, 2003, Plaintiff's drawer was simply $41.00 short in cash. (Anderson Aff. ¶¶ 24, 25, Exs. E, F, G.) The Court does not find this tangential factual dispute material to resolution of the issues of race discrimination in this case.

-5-

and demanded to know why the drawer of the other cashier, Georgia Mulvihill (white female), was not being counted, as Plaintiff believed that Mulvihill's drawer had come up short numerous times in the past.[4] (Anderson Aff. ¶ 22; Wainright Aff. ¶ 21; Wainright Dep. at 61-62, 83-84, 121, 123.) Plaintiff alleges that the conversation proceeded as follows:

> [Wainright]: "Am I the only one that you are pinpointing, and why aren't you checking the other register?"
> [Anderson]: "It was your register that I'm concerned about."
> [Wainright]: "Why? Because I'm black and Georgia is not. You trust Georgia because she is white, and you think that there is a problem because I'm black."

(Wainright Dep. at 83-84.) Plaintiff alleges that Anderson "really wouldn't comment on it" and that the "only thing she would say was, 'You just bring me your register.'" *Id.* at 84.

The next morning, Plaintiff forgot to take her drawer to Anderson for counting as instructed. (Wainright Dep. at 61-62; Anderson Aff. ¶ 22.) Plaintiff alleges that when Anderson became quite angry at Plaintiff for forgetting about her cash drawer, Plaintiff asked her if "it was because I was black." (Wainright Dep. at 62; Wainright Aff. ¶ 23.) Plaintiff alleges that Anderson responded, "You know, my best friend is black." *Id.* Plaintiff's reply to Anderson was, "I don't care about your best friend. I'm wondering why I'm feeling this hostility just toward me . . .." *Id.*

_____

[4]Mulvihill avers that, contrary to Plaintiff's speculation, Anderson did in fact count her drawer on one occasion. (Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J., Ex. B, Georgia Mulvihill Aff. ¶ 10.)

On Thursday, April 10, 2003, Anderson verbally counseled Plaintiff and Mulvihill for talking too loudly while at the front desk, failing to keep the travel maps properly stocked, leaving the front desk unattended, and taking too many personal telephone calls. (Wainright Dep. at 106-07; Anderson Aff. ¶ 28.) In deposition testimony, Plaintiff gave additional details concerning this counseling:

Q: Well, isn't it true that Linda had to have a meeting with you and Georgia in early April to talk to you about the arguing with one another at the front desk?

A: No. She only had a meeting with us – she said we were too friendly at the front. She said that we laughed and played too much at the front. That had nothing to do with that we didn't like each other at the front. She said that you guys – that we were excessively too friendly at the front was the words that she put.

Q: So was she saying that you were being too friendly to one another?

A: Oh, yeah, she said that by us sitting there, and we would be laughing or, you know, talking about something, and she would come flying out of the office and she would say, "You guys aren't being professional at the front. You guys need to tone it down, you know." And we would look like, "Okay, there is nobody in here." You know, you don't have to tell me how to do my job. I've been here almost two years before this woman came in. I didn't understand why she said we were unprofessional. We knew that we were supposed to be professional at the front. We would not have done that if we had customers at the front. This is not like it was an ongoing, everyday thing.

Q: So Linda when she had this conversation with you and Georgia, she also directed these comments to Georgia too, right?

A: Yeah.

Q: Georgia was white, right?

A:      Yeah.

Q:      And you didn't see anything discriminatory , did you, about Linda telling you and Georgia to tone it down at the front desk?

A:      No.

(Wainright Dep. at 100-01.)

On Friday, April 11, 2003, Plaintiff asked Anderson if she could go home sick. (Anderson Aff. ¶ 30; Wainright Dep. at 141.)  Anderson told Plaintiff that she needed Plaintiff to stay, because several other employees were out, either on vacation or sick leave, and the office was understaffed.  *Id.*; Wainright Dep. at 141-42.  Plaintiff was bitterly unhappy with Anderson's decision.  *Id.*; Wainright Dep. at 142-44.  In the meantime, Anderson had arranged for two employees to come in on their day off to help out. (Anderson Aff. ¶ 30.)  Later that day, Anderson received an emergency call that her daughter had collapsed in Raleigh and was being rushed to hospital.  *Id.*; Wainright Dep. at 143-44. Anderson arranged to have an employee from AAA's Greensboro office fill in for her and left the office to attend to her daughter's emergency.  *Id.*; Wainright Dep. at 144. Anderson's departure further infuriated Plaintiff.  (Wainright Dep. at 144.)  Plaintiff's deposition testimony on this point concludes, "I'm standing there like, okay, you can leave, but you told me I couldn't.  You know, what's wrong with this picture?"  *Id.*

Following this incident, Anderson had reached the end of her rope with Plaintiff and "was strongly considering terminating" Plaintiff.  (Anderson Aff. ¶ 31.)  Anderson sent Fenton an email from her home on Sunday, April 13, 2003, setting out in considerable detail

-8-

all of the various problems she was having with Plaintiff's performance. *Id.*, Ex. H; Fenton Aff. ¶ 10, Ex. A. Fenton considered the matter serious enough to respond by telephoning Anderson on Monday, April 14, 2003. *Id.* ¶ 32; Fenton Aff. ¶ 10. Fenton and Anderson agreed that Plaintiff should be terminated and left the timing of the termination up to Anderson. *Id.*

On Thursday, April 17, 2003, Anderson was out of the office attending a seminar in Charlotte. (Anderson Aff. ¶ 33; Wainright Dep. at 65; Wainright Aff. ¶ 26; Fenton Aff. ¶ 11.) Plaintiff alleges that she called Fenton and told him that she believed Anderson was discriminating against her. (Wainright Dep. at 137-38; Wainright Aff. ¶ 26.) Fenton told Plaintiff that he would meet with her the next time he visited the Winston-Salem office. (Wainright Dep. at 65, 138-39; Wainright Aff. ¶ 26.) Apparently unsatisfied with Fenton's response, Plaintiff then called Fenton's direct supervisor, Vice-President of Travel and Branch Operations Sarah Henshall. (Wainright Dep. at 66, 140; Wainright Aff. ¶ 26.) Plaintiff alleges that she repeated her complaint of race discrimination to Henshall. (Wainright Dep. at 140; Wainright Aff. ¶ 26.) Henshall made an appointment for Plaintiff to come to AAA's Charlotte headquarters the following Monday, April 21, 2003. (Wainright Dep. at 66; Wainright Aff. ¶ 26.) At some point during her shift on Thursday, April 17, 2003, Plaintiff cleared her desk and work area of her personal belongings. Plaintiff maintains she did this because she intended to ask Fenton and Henshall for a transfer to AAA's Greensboro office. (Wainright Dep. at 77-78; Wainright Aff. ¶ 25.)

-9-

On Friday, April 18, 2003, Anderson called Plaintiff into her office to discuss a discrepancy on Plaintiff's time sheet from the day before. (Anderson Aff. ¶ 35; Wainright Dep. at 66-67, 124-25; Wainright Aff. ¶ 27.) Anderson had been informed that Plaintiff had been away from the office for several hours, and Plaintiff's time sheet did not reflect this absence. (Anderson Aff. ¶ 35.) Plaintiff did not dispute that she had failed to mark her absence on the time sheet. (Wainright Dep. at 67, 124-25; Wainright Aff. ¶ 27.) In her deposition, Plaintiff testified that the following exchange took place between Plaintiff and Anderson following discussion of Plaintiff's time sheet:

> [A]t that particular moment when she said [sic] the incident about the timesheet . . . I said, "You know, I guess I'm just never going to get it right with you as long as I'm black, right?"
>
> And she kind of was like (witness indicates.) To me, it was like, "Well, you got the picture. You are finally getting the picture."

(Wainright Dep. at 81.) Following this testimony, the following exchange took place between Plaintiff and counsel for AAA:

> Q: Just to make it clear. In your testimony, you have indicated that on several occasions, you said to Linda, "Is it because I'm black?" And I didn't hear you say that she ever acknowledged that. She never said, "Yes, it's because you are black," right?
>
> A: No, it did not come out of her mouth. Her actions spoke louder than words to me, but she's not – she is a very professional woman, so she's not going to do something that she literally knows you can pinpoint her on.
>
> Q: She never made any racially derogatory comments to you, racial epithets or anything like that?

-10-

A:     Not that I can remember.

Q:     So really that perception of yours is based upon these things that you just mentioned, in comparing yourself to what happened to other employees?

A:     Right.

*Id.* at 81-82.

In Plaintiff's affidavit submitted in opposition to AAA's motion for summary judgment, Plaintiff's testimony on this point is materially different. Plaintiff's averment reads as follows: "I asked her why she turned down everything I requested. I asked her if it was because I am Black. She would not answer me. I said that I guess I was never going to get it right because I'm Black. *She nodded her head*."[5] (Wainright Aff. ¶ 24)(emphasis added).

According to Plaintiff, Anderson then asked Plaintiff about her appointment with Henshall in Charlotte. (Wainright Dep. at 66-67; Wainright Aff. ¶ 27.) Plaintiff told Anderson about her belief that Anderson was discriminating against her because she is black. *Id.* Anderson, according to Plaintiff, became angry and told Plaintiff that she was not going to Charlotte, and then yelled, "Okay bitch, I'm going to solve this for both of us. You're fired." (Wainright Dep. at 67-68, 146; Wainright Aff. ¶ 27.) Anderson then

---

[5] The testimony that Anderson "nodded her head" in response to Plaintiff's statement that she was never going to get it right because she was black does not appear in Plaintiff's EEOC charge (Wainright Aff., Ex. 5), complaint, verified responses to AAA's First Set of Interrogatories (Wainright Dep., Ex. 2), or Plaintiff's deposition.

escorted Plaintiff to her desk to collect her personal belongings and out of the office. (Anderson Aff. ¶ 35.)

On May 7, 2003, Plaintiff filed a charge of race discrimination and retaliation with the Equal Employment Opportunity Commission ("EEOC"). (Wainright Aff. ¶ 28, Ex. 5.) On November 20, 2003, the EEOC issued Plaintiff a "Notice of Right to Sue," *see* Wainright Dep., Ex. 5, and this lawsuit followed.

### III. Summary Judgment Standard of Review

The summary judgment standard of review under Rule 56 of the Federal Rules of Civil Procedure is well established. A party is entitled to judgment as a matter of law upon a showing that "there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c). The material facts are those identified by controlling law as essential elements of claims asserted by the parties. A genuine issue as to such facts exists if the evidence forecast is sufficient for a reasonable trier of fact to find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). No genuine issue of material fact exists if the nonmoving party fails to make a sufficient showing on an essential element of its case as to which it would have the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In evaluating a forecast of evidence on summary judgment review, the court must view the facts and inferences reasonably to be drawn from them in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255.

-12-

When the moving party has carried its burden, the nonmoving party must come forward with evidence showing more than some "metaphysical doubt" that genuine and material factual issues exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), *cert. denied,* 481 U.S. 1029 (1987). A mere scintilla of evidence is insufficient to circumvent summary judgment. *Anderson*, 477 U.S. at 252. Instead, the nonmoving party must convince the court that, upon the record taken as a whole, a rational trier of fact could find for the nonmoving party. *Id*. at 248-49. Trial is unnecessary if "the facts are undisputed, or if disputed, the dispute is of no consequence to the dispositive question." *Mitchell v. Data General Corp.*, 12 F.3d 1310, 1315-16 (4th Cir. 1993).

### IV. Discussion

A.    Discriminatory Discharge

In her Verified Complaint, Plaintiff alleges that Defendant AAA terminated her because of her race in violation of Title VII, 42 U.S.C. § 1981, and the public policy of North Carolina as expressed in the North Carolina Equal Employment Practices Act ("EEPA"), N.C. Gen. Stat. § 143-422.2. As Plaintiff has not presented any direct evidence of discrimination, the Court will proceed to analyze Plaintiff's discrimination claims under the well-established inferential proof scheme set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) and its progeny, which applies not only to Plaintiff's Title VII claim, but also to her Section 1981 and wrongful discharge claims. *Patterson v. McLean Credit Union*, 491 U.S. 164, 181-82 (1989); *Gairola v. Virginia Dep't of Gen. Servs.*, 753 F.2d 1281, 1285-

-13-

86 (4th Cir. 1985); *North Carolina Dep't of Corr. v. Gibson*, 308 N.C. 131, 141, 301 S.E.2d 78, 85 (1983).

Pursuant to the *McDonnell Douglas* proof scheme, Plaintiff must first establish a prima facie case of discrimination by a preponderance of the evidence. *McDonnell Douglas*, 411 U.S. at 802. If Plaintiff succeeds, the burden of production shifts to Defendant to articulate a legitimate, nondiscriminatory reason for Plaintiff's termination. *Id.* If Defendant carries this burden, Plaintiff must prove by a preponderance of the evidence that the legitimate, nondiscriminatory reason offered by Defendant is not the true reason, but is a pretext for race discrimination. *Id.*; *see also Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981). Although the second step of the process shifts the burden of production to Defendant, the burden of persuasion remains at all times on Plaintiff to prove that Defendant was unlawfully motivated by Plaintiff's race. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510-11 (1993).

In order to establish a prima facie case of discriminatory discharge, Plaintiff must demonstrate that (1) she is a member of a protected class; (2) she suffered an adverse employment action; (3) at the time of the adverse employment action, she was performing at a level that met her employer's expectations; and (4) her position remained open or was

-14-

filled by a similarly qualified applicant outside the protected class.[6]  *King v. Rumsfeld*, 328 F.3d 145, 149 (4th Cir.), *cert. denied*, 540 U.S. 1073 (2003); *Karpel v. Inova Health Sys. Serv.*, 134 F.3d 1222, 1228 (4th Cir. 1998).  Defendant AAA argues that Plaintiff's evidence is insufficient to establish either the third or the fourth element of the prima facie case.

The Court agrees that Plaintiff's evidence fails to make out a prima facie case of discriminatory discharge.  There is no dispute between the parties that Plaintiff is a member of a protected class (black) or that her termination constitutes an "adverse employment action."  However, the Court finds that Plaintiff's evidence fails to create a triable issue of fact as to either element three or element four of the prima facie case.

In regard to element three, there is undisputed evidence in the record pre-dating the events immediately surrounding Plaintiff's termination[7] that Plaintiff was not performing her job at a level that met AAA's legitimate expectations.  Plaintiff admits Anderson verbally counseled her for talking too loudly while at the front desk, failing to keep the travel maps

---

[6] Defendant AAA has phrased the fourth element of the prima facie case slightly differently than the Court.  AAA asserts that the fourth element requires evidence that similarly situated employees outside the protected class were retained in employment.  The Court will analyze Plaintiff's evidence under both versions of the fourth element.

[7] If, as AAA argues, the actions giving rise to a termination decision could be used to show that an employee was not performing at a level that met the employer's expectations, discharged employees could rarely establish a prima facie case of discriminatory discharge. *See, e.g., Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 660-66 (6th Cir. 2000)(district court set the burden of establishing a prima face case "far too high" and "conflated the distinct stages of the *McDonnell Douglas* inquiry by using [the employer's] 'nondiscriminatory reason' as a predicate" for finding that the employee failed to show that she was meeting the legitimate expectations of her employer).  The burden of establishing a prima facie case is not intended to be a heavy one. *Burdine*, 450 U.S. at 253.

properly stocked, leaving the front desk unattended, and taking too many personal telephone calls. (Wainright Dep. at 100-01, 106-07; Anderson Aff. ¶ 28.) In addition, Plaintiff does not and cannot dispute the fact that Anderson sent an email to Fenton which documents in great detail the various ways in which Anderson believed Plaintiff was not meeting AAA's expectations, including the precise matters covered in the verbal counseling. (Anderson Aff. ¶ 31, Ex. H.) Anderson reported to Fenton that Plaintiff was angry and had a bad attitude. *Id.* The Court notes that Plaintiff's own deposition testimony clearly demonstrates a defiant, disrespectful attitude toward Anderson:

> [S]he would say, "You guys aren't being professional at the front. You guys need to tone it down . . .." And we would look like, "Okay, there is nobody in here." You know, you don't have to tell me how to do my job. I've been here almost two years before this woman came in.

(Wainright Dep. at 101.)

> Okay, I was in this office with a fever. Didn't even need to be in there, but she wouldn't let me leave. This was the same day – this woman got a phone call – now, keep in mind, you just said that we were short staffed. She had a phone call in reference to her daughter being sick. Do you think she stopped to say, "Well, I'm short staffed, and I can't make it." No. She was out of there.
>
> . . . .
>
> I'm standing there like, okay, you can leave, but you told me I couldn't. You know, what's wrong with this picture?

(Wainright Dep. at 143-44.)

To be sure, Plaintiff emphatically denies she engaged in much of the misconduct and poor performance Anderson alleges. (Wainright Aff. ¶¶ 31, 32, 34.) However, Plaintiff's

-16-

mere denial of the misconduct and poor performance is insufficient to show that Plaintiff was meeting AAA's legitimate expectations. *King*, 328 F.3d at 149 ("King's own testimony, of course, cannot establish a genuine issue as to whether King was meeting [the employer's] expectations."); *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 960-61 (4th Cir. 1996)("It is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff.")(citations omitted); *Jones v. Southcorr, L.L.C.*, 324 F. Supp. 2d 765, 781 (M.D.N.C. 2004)(Beaty, J.). In addition, Plaintiff herself recognizes that Anderson was frequently dissatisfied with Plaintiff's performance. (Wainright Aff. ¶ 13)("She was constantly finding fault with my work and with me. Nothing I did was right.")

Similarly, the affidavit of Plaintiff's former co-worker, Georgia Mulvihill, in which Mulvihill avers that Plaintiff was a good employee and did not engage in the misconduct alleged, is insufficient to establish that Plaintiff was meeting AAA's expectations.[8] *King*, 328 F.3d at 149; *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 280 (4th Cir. 2000)("The alleged opinions of Hawkins' co-workers as to the quality of her work are [] close to irrelevant."); *Tinsley v. First Union Nat'l Bank*, 155 F.3d 435, 444 (4th Cir. 1998)("[A]lthough the affidavits put forth by Tinsley document the fact that certain co-workers, Bank customers, and attorneys believed Tinsley was doing a good job, they fail to address whether management honestly believed that Tinsley was doing a good job.") In addition, the affidavit

---

[8]The same can be said of the February 3, 2003 email from a customer to Plaintiff praising Plaintiff's customer service and the February 24, 2003 email from co-worker Jan Lowe to Plaintiff praising her customer service skills. (Wainright Aff., Attachs. 3, 4.)

-17-

of Plaintiff's former manager, Cathy Picone, in which Picone describes Plaintiff as a good employee, is not at all relevant to the issue of whether Plaintiff was meeting *AAA's expectations while under Anderson's supervision.*[9] Critically, Plaintiff has not offered any *objective* evidence that she was meeting AAA's expectations, e.g., documentary evidence of Plaintiff's punctuality and regular attendance; documentary evidence that Plaintiff's cash drawer consistently balanced; or even evidence that Plaintiff received a pay raise, a positive performance review, or awards from AAA while under Anderson's supervision. (Wainright Dep. at 94, 105-06.) Plaintiff's evidence is insufficient to create a triable issue of fact that she was meeting the legitimate expectations of AAA.

With regard to element four, the Court finds that Plaintiff's evidence is insufficient to create a triable issue under either Plaintiff's or AAA's version of element four of the prima facie case. First, there is simply no evidence in the record that Plaintiff's position remained open following her termination. Plaintiff asserts in her brief that is it "undisputed" that her "position remained open" following her termination, without providing the Court with a single record citation to support that proposition. (Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J. at 13.) It is Plaintiff's burden to present this evidence to establish a prima facie case of discriminatory discharge. If in fact Plaintiff's position did remain open following her termination, Plaintiff should have presented admissible evidence of this fact to the Court.

---

[9] The same can be said of the "Super Service Award" given to Plaintiff by AAA in 2002 while Plaintiff was under Picone's supervision. (Wainright Aff., Attach. 2.)

Case 1:03-cv-01185-PTS   Document 17   Filed 04/27/05   Page 18 of 30

Second, there is also no record evidence that Plaintiff's position was filled by a similarly qualified applicant outside the protected class (i.e., non-black). Third, there is no evidence that similarly situated employees outside the protected class (i.e., non-black employees engaging in similar misconduct or poor performance) were retained in employment. In fact, there is undisputed evidence that a similarly situated white employee, Georgia Mulvihill, was counseled and ultimately terminated for similar performance problems on November 20, 2003.[10] (Anderson Aff. ¶¶ 8, 10, 14, 28, 38, 39; Mulvihill Aff. ¶ 15; Wainright Dep. at 100-01, 106-08, 128.) Plaintiff's evidence is insufficient to create a triable issue of fact as to the fourth element of the prima facie case of discriminatory discharge.

In light of Plaintiff's failure to create a triable issue as to her claims of discriminatory discharge, **IT IS ORDERED** that Plaintiff's claims of discriminatory discharge under Title

---

[10] While there is evidence that another white employee, Karolina Sorg, was terminated by Anderson on March 17, 2003, *see* Anderson Aff. ¶¶ 8, 11, 39; Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J., Ex. F, Karolina Inge Sorg Aff. ¶ 10, the Court does not find that Sorg was "similarly situated" to Plaintiff. AAA's evidence is that Sorg was terminated for failing to meet sales goals, which is not similar to being terminated for insubordination and repeated failure to follow work rules, as Plaintiff was. *See Hutson v. McDonnell Douglas Corp.*, 63 F.3d 771, 777 (8th Cir. 1995)(the compared employees must be similarly situated in all relevant respects); *Smith v. Stratus Computer,* 40 F.3d 11, 17 (1st Cir. 1994)(the colleagues to whom the plaintiff compares herself must be similar to the plaintiff in *every* material respect – thus, the plaintiff must demonstrate the same work-related flaws in her comparators); *Mitchell v. Toledo Hosp.,* 964 F.2d 577, 583 (6th Cir. 1992)(before employees can be viewed as comparable, they must work under the same standards and same supervisors, and engage in the same conduct).

VII and Section 1981, and her claim of wrongful discharge in violation of public policy be dismissed with prejudice.

B.    Retaliation

In her Verified Complaint, Plaintiff alleges that she was retaliated against for complaining to members of AAA's management about race discrimination.  In order to establish a prima facie case of retaliation, Plaintiff must establish that (1) she engaged in protected activity; (2) she suffered an adverse employment action; and (3) a causal link exists between the protected activity and the adverse employment action.  *Beall v. Abbott Labs.*, 130 F.3d 614, 619 (4th Cir. 1997).

Neither party disputes that Plaintiff's termination constitutes an "adverse employment action."  However, whether Plaintiff has presented sufficient evidence of a causal link is strongly contested.  On one hand, there is undisputed and documentary evidence that the decision to terminate Plaintiff was made by Fenton and Anderson *4 days prior* to Plaintiff's April 17th and 18th complaints to Anderson, Fenton and Henshall about race discrimination, *see* Anderson Aff. ¶ 32; Fenton Aff. ¶ 10, which would rule out any causal connection between Plaintiff's complaints and her termination.  *Newbold v. Wisconsin State Pub. Defender*, 310 F.3d 1013, 1016 n.1 (7th Cir. 2002)("Even more deadly to Newbold's retaliation claim is her own theory of her case . . . Newbold argued that a supervisor at the WSPD decided to fire her in April 1995 – before she had engaged in any protected activity."); *Slattery v. Swiss Reins. Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001)("Where timing

is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise."); *Windfelder v. May Dep't Stores Co.*, No. 03-1879, 2004 WL 362292, *4 (3d Cir. Feb. 26, 2004)(unpublished opinion)("Kaufmann's had already begun termination proceedings against Windfelder, and without other evidence of retaliation, it need not halt those proceedings simply because Windfelder wrote a letter alleging retaliation. A contrary holding might impede employers from permissible terminations and encourage employees aware of an impending termination to attempt to create their own 'severance package.'")

On the other hand, taking Plaintiff's evidence in the light most favorable to her, there is also evidence that Plaintiff complained to Anderson at least once about race discrimination *a few days before* the April 14, 2003 decision by Anderson and Fenton to terminate Plaintiff. *See* Wainright Aff. ¶ 23; Wainright Dep. at 62, 83-84. This short period of time between Plaintiff's discrimination complaint and her termination can be sufficient under Fourth Circuit precedent to create an inference of a causal link between Plaintiff's race discrimination complaint and her termination. *See Williams v. Cerberonics, Inc.*, 871 F.2d 452 (4th Cir. 1989)(plaintiff stated a prima facie case even though no evidence of a causal connection existed other than the fact that plaintiff had engaged in protected activity and was subsequently discharged); *McNairn v. Sullivan*, 929 F.2d 974 (4th Cir. 1991)(same); *Perry-Bey v. City of Norfolk*, No. Civ.A.2:02CV07, 2002 WL 32373193, *6 (E.D. Va. Oct. 30, 2002)(unpublished opinion)(despite evidence that employer intended to fire the plaintiff

-21-

before discovering she had filed an EEOC charge, in light of Fourth Circuit precedent, court holds the plaintiff made out a prima facie case of retaliation).

The Court reaches the question of whether Plaintiff has engaged in "protected activity." "Protected activity" under Title VII's so-called "opposition clause"[11] involves an employee's verbal or written opposition to her employer's conduct which she believes is discriminatory. *See* 42 U.S.C. § 2000e-3(a)(it is "an unlawful employment practice for an employer to discriminate against any of its employees . . . because he has opposed any practice made an unlawful employment practice by [Title VII].") This protected oppositional activity includes informal complaints of discrimination to management. *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 259 (4th Cir. 1998). Moreover, Plaintiff need not establish that the employment practices she opposed in fact violated Title VII or another anti-discrimination law to be protected. *Ross v. Communications Satellite Corp.*, 759 F. 2d 355, 357 n.1 (4th Cir. 1985). However, Plaintiff's belief that she was opposing unlawful race discrimination must (1) have been held in subjective good faith; and (2) be objectively reasonable. *Peters v. Jenney*, 327 F.3d 307, 321 (4th Cir. 2003). "Objectively reasonable" means reasonable in light of the facts of the case and current, substantive caselaw. *Peters*, 327 F.3d at 321; *Harper v. Blockbuster Entm't Corp.*, 139 F.3d 1385, 1388 & n.2 (11th Cir.

---

[11] The other form of "protected activity" under Title VII, which arises under the "participation clause," is not at issue in this action. *See* 42 U.S.C. § 2000e-3(a)(it is "an unlawful employment practice for an employer to discriminate against any of its employees . . . because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII].")

-22-

1998)("If the plaintiffs are free to disclaim knowledge of the substantive law, the reasonableness inquiry becomes no more than speculation regarding their subjective knowledge.")

Here, Plaintiff's alleged informal complaints to Anderson, Fenton and Henshall regarding perceived race discrimination on the part of Anderson certainly fall within the ambit of Title VII's opposition clause. Further, the Court will assume, *arguendo*, that Plaintiff's belief that she had been the victim of race discrimination was held in subjective good faith. Nonetheless, the Court finds that Plaintiff's belief was clearly not objectively reasonable in light of the evidence in this case and current, substantive law. One of Plaintiff's primary bases for her subjective belief that Anderson discriminated against her is that after discovering a cash shortage, Anderson counted her cash drawer "every morning and evening" but did not count the cash drawer of a white cashier, Georgia Mulvihill. (Pleading No. 1, Verified Compl. ¶ 18; Wainright Aff. ¶¶ 20, 21.) Yet, Plaintiff's own evidence shows that Anderson counted Plaintiff's drawer on only one or two occasions and, in fact, counted Mulvihill's drawer once. (Wainright Dep. at 58-64; Mulvihill Aff. ¶ 10.) Additionally, Plaintiff claims that Anderson was sharply critical of her and did not treat white employees in the same manner. (Wainright Aff. ¶ 13.) Yet Plaintiff contends that Anderson verbally counseled her on only one occasion, and that Mulvihill was counseled at the same time, in the same manner, and for the same performance issues. Plaintiff concedes that this counseling was not discriminatory. (Wainright Dep. at 100-01, 103, 106-08.) Similarly,

-23-

Plaintiff claims that Anderson "repeatedly" checked her timecard. (Compl. ¶ 20; Wainright Aff. ¶ 18.) However, Plaintiff admits that Anderson checked her timecard only once, and Plaintiff did not dispute that she had in fact failed to mark an absence of several hours on that timecard. (Wainright Dep. at 124-25.)

Plaintiff admits that Anderson never directed any racial comments to her. (Wainright Dep. at 82, 95-96.) Plaintiff places great emphasis on the fact that she was the only black employee in AAA's Winston-Salem branch office, *see* Compl. ¶ 13; Wainright Aff. ¶ 2; Wainright Dep. at 99, but the Court notes that there were only a total of eight employees in that office. (Anderson Aff. ¶ 7.) Thus, approximately 12.5 percent of the Winston-Salem branch office was black, which mirrors the percentage of blacks in the United States population as a whole. *See* http://www.census.gov/ipc/www/usinterimproj/natprojtab01a .pdf, U.S. Census Bureau, Population Div., Population Projections Branch, July 1, 2000 (as of July 1, 2000, African-Americans comprised approximately 12.7 percent of the United States' population.) Plaintiff has presented no evidence of statistical significance within such a small sample. In addition, AAA has presented evidence that the average total number of persons it employed at any one time during the time period from 2000 to 2003 was 680, and that AAA employed a total of 511 blacks during this time period. These black employees were employed in AAA's Charlotte headquarters, in branch offices, in call-centers and in

repair centers.[12]  (Pleading No. 15, Def.'s Reply in Supp. of Summ. J., Burton Dep. at 101-02.)  Finally, Plaintiff has not proffered any evidence that her position was filled by a non-black applicant.

The only proffered evidence in the record to suggest that Plaintiff's race played any role in Anderson's treatment of Plaintiff is Plaintiff's new averment in her summary judgment affidavit that Anderson purportedly "nodded her head" when Plaintiff stated, "I guess I [am] never going to get it right because I'm Black." (Wainright Aff. ¶ 24.)  However, the Court will not consider this statement on summary judgment review, because its presentation after discovery violates the rule of law against the changing of testimony for the very purpose of creating an issue of fact and avoiding summary judgment.  Plaintiff's new averment about head-nodding impermissibly contradicts earlier sworn statements made by Plaintiff in several places in the record before the Court.

Plaintiff's allegation that Anderson "nodded her head" appears nowhere in Plaintiff's detailed, 55-paragraph verified complaint.[13]  In its first set of interrogatories to Plaintiff, AAA requested that Plaintiff (1) describe every incident of race discrimination and retaliation to which Plaintiff was subjected while employed at AAA (interrogatory number 11); (2) identify the course of action taken by any person to whom a complaint of race discrimination

---

[12] Plaintiff admits she did not confirm the allegation in paragraph 13 of her complaint that there were no black employees outside of the Charlotte AAA headquarters.  (Wainright Dep. at 127-28.)

[13] Nor does it appear in Plaintiff's EEOC charge against AAA, which she signed under penalty of perjury.  (Wainright Dep., Ex. 4.)

was made (interrogatory number 15); and (3) state in detail the substance of any statements made by any manager of AAA which Plaintiff contends evidences an intent to discriminate against Plaintiff because of her race or retaliate against Plaintiff for complaining about race discrimination (interrogatory number 19). Plaintiff did not state that Anderson "nodded her head" anywhere in her verified responses to AAA's interrogatories. The Court finds it particularly telling that Plaintiff did not mention Anderson's alleged affirmative head-nodding in her response to interrogatory number 19, which was clearly on point. Plaintiff's entire response to this interrogatory reads as follows:

> On April 18, 2003, I told Ms. Anderson that I believed she was discriminating against me because of my race. I told her I had an appointment with Sarah Henshall in Charlotte about it. She was yelling at me and slamming things on her desk. She told me, "ok bitch, you're fired."

(Wainright Dep., Ex. 2 at 15.)

Similarly, Plaintiff's new averment that Anderson "nodded her head" effectively contradicts Plaintiff's earlier sworn deposition testimony. Plaintiff testified as follows:

> I said, "You know, I guess I'm just never going to get it right with you as long as I'm black, right?"
>
> And she kind of was like (witness indicates.) To me, it was like, "Well, you got the picture. You are finally getting the picture."

(Wainright Dep. at 81.) The above-quoted testimony, containing equivocations such as "kind of," "like," and "to me" is certainly not a statement that Anderson "nodded her head." A head nod is a well understood, unequivocally affirmative statement, yet Plaintiff's deposition testimony was *not* that Anderson nodded her head. Moreover, taken in its full context,

Plaintiff's deposition testimony forecloses any new averment that Anderson made such an affirmative response:

> Q:    Just to make it clear.  In your testimony, you have indicated that on several occasions, you said to Linda, "Is it because I'm black?"  And *I didn't hear you say that she ever acknowledged that.*  She never said, "Yes, it's because you are black," right?

> A:    No, it did not come out of her mouth.  Her actions spoke louder than words to me, but she's not – *she is a very professional woman, so she's not going to do something that she literally knows you can pinpoint her on.*

> Q:    She never made any racially derogatory comments to you, racial epithets or anything like that?

> A:    Not that I can remember.

*Id.* at 81-82 (emphasis added.)  Thus, in the complete context of her testimony, Plaintiff has clearly testified that Anderson neither did nor said anything that was racially derogatory in response to Plaintiff's questions.  Furthermore, on repeated occasions in her deposition, Plaintiff made it absolutely clear that she based this race discrimination lawsuit on Anderson's differential treatment of Plaintiff and white employees and not on any statements, comments, or affirmative actions by Anderson in response to Plaintiff's repeated queries about her race.  *See, e.g.,* Wainright Dep. at 82, 95-96.

In light of the fact that Plaintiff's new averment that Anderson "nodded her head" in response to Plaintiff's question about her race contradicts Plaintiff's prior discovery responses and deposition testimony, the Court will not consider such evidence on summary judgment review.  *See Barwick v. Celotex Corp.,* 736 F.2d 946, 960 (4th Cir.1984)("If a party

who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact.")(citation and internal quotations omitted); *Rohrbough v. Wyeth Labs., Inc.,* 916 F.2d 970, 975 (4th Cir.1990)("A genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting versions of the plaintiff's testimony is correct.")(quoting *Barwick*, 736 F.2d at 960); *Wiley v. United Parcel Serv., Inc.*, 102 F. Supp. 2d 643, 653 (M.D.N.C. 1999)(Osteen, J.)(Court refused to consider portions of an affidavit that contradicted the plaintiff's earlier testimony). Accordingly, there is *no* evidence in the record that could support a reasonable belief by Plaintiff that she was being discriminated against.[14] Thus, the Court finds that Plaintiff's subjective belief that she was the victim of

---

[14] Moreover, even if the Court were to consider Plaintiff's new "head nod" averment, that averment alone would not form the basis for finding that Plaintiff had an objectively reasonable basis for believing she was being discriminated against on the basis of race. The evidence is that Plaintiff repeatedly asked Anderson, her supervisor, if race were the reason for Anderson's actions. The first time, Anderson simply ignored Plaintiff's question. (Wainright Dep. at 84.) The second time, Anderson answered that her best friend was black, an answer presumably well-intentioned by Anderson, but which Plaintiff interprets as demonstrating racial bias. *Id.* at 62, 97-98; Wainright Aff. ¶ 23. On the third occasion, Plaintiff asked the question in a classic "double-bind" form: "I guess I'm just never going to get it right with you as long as I'm black, right?" (Wainright Dep. at 81.) This is a question similar to "have you stopped beating your wife yet?" Which half of the question is the Court to consider Anderson to have answered if it were to entertain Plaintiff's new averment that Anderson "nodded her head?" If such a series of questions and responses is to be considered a reasonable and objective basis for believing one is being discriminated against, the test for an objectively reasonably basis for belief in discrimination will have effectively been written out of the law.

-28-

race discrimination was not "objectively reasonable." It follows as a matter of law that Plaintiff's complaints of race discrimination were therefore not "protected activity" within the meaning of Title VII.

As Plaintiff has failed to present sufficient evidence to create a triable issue that she engaged in "protected activity" under Title VII, as that term is defined within Fourth Circuit law, **IT IS ORDERED** that Plaintiff's retaliation claim be dismissed with prejudice.

C.      Failure to Promote

In her Verified Complaint, Plaintiff alleges that AAA failed to promote her to assistant manager because of her race. In order to establish a prima facie case of failure to promote, Plaintiff must show: (1) she is a member of a protected class; (2) she applied for a specific position; (3) she was qualified for that position; and (4) the employer rejected her application under circumstances that give rise to an inference of discrimination. *Williams v. Giant Food, Inc.*, 370 F.3d 423, 430 (4th Cir 2004). AAA argues that Plaintiff's evidence is insufficient to establish elements two, three and four of her prima facie case of discriminatory failure to promote.

At the outset, the Court notes that Plaintiff failed to make any argument in her brief regarding her failure to promote claim. In the face of AAA's arguments and supporting evidence in its brief in support of summary judgment, Plaintiff's failure to argue this claim is tantamount to abandonment of the claim. *See* Local Rule 7.3(k).

Case 1:03-cv-01185-PTS   Document 17   Filed 04/27/05   Page 29 of 30

In any event, the Court agrees with AAA that Plaintiff's evidence is insufficient to show a prima facie case, because the undisputed evidence is that there was no formal position of assistant manager in the Winston-Salem AAA office, and thus, that Plaintiff could not and did not apply for a non-existent position. (Burton Dep. at 13, 105; Wainright Dep. at 11-18, 33, 36, 133.) Furthermore, there is undisputed evidence that Townes Carter, the employee who temporarily assisted Anderson, was more qualified than Plaintiff. (Wainright Dep. at 84, 130-35; Carter Aff. ¶ 11.)

In light of Plaintiff's failure to create a triable issue as to her failure to promote claim, **IT IS ORDERED** that Plaintiff's failure to promote claim be dismissed with prejudice.

## V.  Conclusion

For the reasons stated above, **IT IS HEREBY ORDERED** that the motion for summary judgment of Defendant AAA (Pleading No. 12) be **GRANTED,** and that all of Plaintiff's claims in this action be dismissed with prejudice.  A judgment dismissing this action with prejudice will be entered contemporaneously with this Memorandum Opinion and Order.


_____
/s/ P. Trevor Sharp
United States Magistrate Judge


Date:  April 27, 2005

-30-